Filed 5/13/16  P. v. Woods CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069451 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB1303214) |
| CORNELIUS DESHAWN WOODS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Annemarie G. Pace, Judge.  Affirmed.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

In this gang-related murder case involving the shooting death of Eddie Barnes, Jr., a jury convicted Cornelius Deshawn Woods of first degree murder (count 1: Pen. Code,[1] § 187, subd. (a)), unlawful possession of a firearm by a felon (count 2: § 29800, subd. (a)), and active participation in a criminal street gang (count 3: § 186.22, subd. (a)). The jury found to be true allegations that in committing the murder Woods personally used and discharged a firearm, causing death (§ 12022.53, subds. (b)-(d)) and that he committed the murder and unlawfully possessed the firearm (a handgun) for the benefit of, in association with, or at the direction of a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members (§ 186.22, subds. (b)(1)(A), (C)). In a bifurcated proceeding, the court found to be true allegations that Woods had suffered a prior serious felony conviction (assault with a firearm in violation of § 245, subd. (a)(2)) within the meaning of section 667, subdivision (a)(1), which also was a strike within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). The court sentenced Woods to an aggregate state prison term of 80 years to life.

Woods appeals his conviction, asserting five contentions. *First*, the court abused its discretion and violated his federal constitutional due process right to a fair trial by admitting evidence through the People's gang expert that he had committed prior gang-related shootings in 2005 and 2006. *Second*, the court violated his federal constitutional due process right to a fair trial by admitting evidence of his conviction of assault with a

_____

[1]     All further statutory references are to the Penal Code unless otherwise specified.

2

firearm as a predicate offense to support the active-participation-in-a-criminal-street-gang charge and enhancement allegation. *Third*, the court committed prejudicial instructional error and violated his federal constitutional due process right to a fair trial by failing to instruct the jury sua sponte under CALCRIM No. 335 that Anthony Walker was an accomplice in the active-participation-in-a-criminal-street-gang crime as a matter of law and that the jury could not rely on Walker's testimony without independent corroborating evidence. *Fourth*, defense counsel provided ineffective assistance in violation of Woods's Sixth Amendment rights by failing to object to (1) the reliance of the People's gang expert on the evidence of Woods's 2006 conviction of assault with a firearm to form his opinion that Woods was a shooter for the Hoover criminal street gang; (2) the prosecution's use of that 2006 conviction as one of six predicate offenses to prove that the Hoover gang is a criminal street gang, and (3) the prosecutor's statements during closing argument that the 2005 and 2006 prior shootings showed Woods's motive as a shooter for the Hoover gang. *Fifth*, cumulative error requires reversal of the judgment. We affirm the judgment.

## FACTUAL BACKGROUND

A. *The People's Case*

1. *The murder, Walker's incriminating testimony, and the surveillance video evidence*

Late in the evening on June 7, 2013, Eddie Barnes, Jr., who was a member of a Blood gang, was shot and killed in the living room of his friend Tanya Cooper's apartment. Barnes, who also was known as Bishop, had been staying with Cooper for a

3

few weeks. Cooper testified that Barnes sold drugs out of her apartment. That night, Cooper retired to her bedroom after five men who were members of the rival Hoover gang came to the apartment. At trial, Cooper identified those men as Andre "Dre" Davis, Davis's brother Jovan "Puna" Smith, Anthony "Ace" Walker, Arbet "Flash" Brown, and another man she did not know at that time but whom she identified at trial as Woods because of the tattoos on his face that she had seen when he was in her apartment and which she later described to Detective Albert Tello of the San Bernardino Police Department. Cooper testified that some of the men entered her apartment, and others remained outside on the balcony.

At some point, from her bedroom, Cooper heard Walker say to Barnes, "Hey, Bishop, I need that." Barnes replied by saying something in a low voice, but Cooper could not make out what he said. At trial, Cooper testified she did not remember telling a police officer that she heard Barnes say, "Okay man, okay." She also did not remember telling the officer she then heard Barnes mumble, "Oh, shit."

Cooper testified she heard gunshots after Barnes mumbled something, and she "froze" and then quickly hid in her closet. She heard "maybe four or five" additional gunshots. Cooper then heard Walker say "a[h] fuck" in a panicked, frightened voice. Cooper testified that it "sound[ed] like [Walker] was shocked." Cooper also testified she left her bedroom closet shortly thereafter and saw Barnes's body as she walked through the living room and left her apartment. Cooper saw Davis when she left the apartment complex.

4

Barnes's cousin, Davis, testified he heard Cooper and Barnes arguing earlier that evening. Barnes had been using cocaine and was still "amped up." Sometime after 9:40 p.m.—when only Cooper, Davis, and Barnes were in Cooper's apartment—Woods, Walker, Brown, and Davis's brother, Smith, came to the apartment.

Davis identified Woods at trial as one of the men who arrived at Cooper's apartment that night. Davis testified he overheard Walker talk with Barnes about buying some drugs. Walker said he needed a "quarter of cocaine" and a "quarter of rock cocaine." Davis left the apartment and went downstairs as Smith and Brown were leaving. Davis heard six or seven gunshots and ran back up to the apartment. He saw Barnes lying on the floor in the apartment near the front door. Davis also saw Cooper come out of her room, grab her purse, and leave. Davis yelled for paramedics and also left. He later identified Woods when Detective Tello showed him a photographic lineup.

a. *Walker's incriminating testimony and the surveillance video clips*

Before the trial began, Walker pleaded guilty in this case to being an accessory after the fact to Barnes's murder and to being an active participant in a criminal street gang. He testified for the prosecution as part of his plea bargain.[2] Walker admitted he was a member of the Hoover gang, and he testified he had various tattoos on his body and face related to both that gang and a subset clique known as Five Deuce. He described his gang tattoos as a "five deuce" on his left hand, a star on his right hand, and a star on the

---

[2] The range of punishment was a maximum of 12 years in prison to a minimum of three years' probation.

5

right side of his face. Walker testified that Woods, Brown and Smith also were Hoover gang members.

Walker indicated that when Detective Tello first interviewed him about two weeks after the shooting he was not completely truthful with Detective Tello because he was afraid of being charged with murder, but he told the detective at that time he thought Woods was the shooter. During that interview, Walker also identified Woods in a photographic lineup that Detective Tello showed him.

Walker testified that Smith and Brown picked him up in Brown's SUV earlier in the evening on June 7, 2013. They drove to a liquor store and then picked up Woods before they went to Cooper's apartment. Walker planned to see his former girlfriend, who lived in another apartment, and then buy drugs from Barnes.

Walker testified that when Woods first got in the SUV, he asked Walker and the others whether they had "a thing," meaning a gun. Woods then got out of the SUV and went somewhere. When he returned to the SUV a couple of minutes later, the group continued on to the apartments.

Walker further testified that he, Woods, Smith and Brown all got out of the SUV when they arrived at the apartment complex, and they all walked up the staircase near apartments Nos. 39 and 42. Walker went up first and the others followed him. Walker went to his former girlfriend's apartment, No. 42. He went inside and talked to her. When Walker left her apartment, he did not see Woods, Smith, or Brown. Walker then walked to Cooper's apartment, No. 39, went inside, and spoke with Barnes about purchasing some drugs. Davis was present when Walker talked to Barnes about drugs.

6

At trial, Walker indicated he did not see Woods, Smith, or Brown in Cooper's apartment when he was talking to Barnes about drugs. He did not see Cooper at all that night.

Walker also testified that a man known as "Car Wash" came inside Cooper's apartment for a couple of minutes, Walker gave him a drink from a bottle of gin he (Walker) had, and Walker and Barnes used cocaine. After Car Wash left, Walker saw Woods, whose street names are "LS" and "Little Stone," standing by the window outside the front door of the apartment. Walker was able to see him through the window because the blinds were pulled back.

As Walker was talking to Barnes, Woods motioned to Walker and told him, "Come on. Let's go." Walker testified that, as he walked out of the apartment, he saw Woods "standing on the side of the door" with a black gun in his right hand. As Walker walked away from Cooper's apartment toward the stairs to go down to the SUV, Woods walked past him toward Cooper's apartment.

Walker testified he then heard one gunshot, and he started running. Walker was "shocked" when he heard the first gunshot, and he yelled out, "What the fuck." He then heard Barnes gasping inside the apartment. Walker also testified that when he started running, he "took a quick glance back" over his left shoulder and saw Woods standing "at the edge" of the front door of Cooper's apartment. Walker did not see where Woods's hands were. Walker heard three or four more gunshots as he ran, but he did not see who was shooting. Walker testified that when the shooting occurred, Davis was "standing right outside the door," smoking a cigarette "[o]n the other side of the door."

7

Walker testified he ran down the stairs toward the SUV and Woods ran down the stairs behind him.  Walker testified he was not running fast because he was holding the gin bottle and also holding up his pants, and he did not stop running until he reached the SUV.

Surveillance camera video clips from the apartment complex, which were played for the jury while Walker was testifying, showed Walker running down the stairs holding the gin bottle in his right hand and holding up his pants with his other hand.  The videos also showed Woods, with his hands in his pockets, running down the stairs behind Walker and exiting the apartment complex with him.[3]  One of the videos showed the SUV passing by.  Walker testified that Brown and Smith were in the SUV, and Brown was driving.

Walker also testified that he and Woods got into the SUV.  Walker also testified that as they were driving away Woods giggled and said to everyone, "That was easy."

Walker, who was in protective custody during the trial, further testified that Woods told him not to testify against him.  He also testified that, although he had not been threatened as a result of this case, he could be killed in prison for testifying because "snitching" is a "no-no" in gang culture.

The prosecutor asked Walker whether he shot Barnes, and Walker replied, "No, I didn't."  The prosecutor also asked Walker, "Did you know this was going to happen to

_____

[3]     During his closing argument, the prosecutor suggested that Woods's running down the stairs in "an unusual posture" with his hands in his pockets, as shown in one of the video clips, showed that Woods had put the handgun in his pocket.

8

[Barnes]?"  Walker answered, "No."  Walker estimated that a couple of minutes passed between his telling Barnes "I need that" in Cooper's apartment and the shooting.

b. *Barnes's gunshot wounds, bullet trajectory evidence, Woods's facial tattoos, and additional surveillance video evidence*

Barnes was shot five times, including twice in the back of his head while he was lying on the living room floor in Cooper's apartment.  The parties stipulated he died from multiple gunshot wounds to the head.

Detective William Flesher, who responded to the scene on the night of the shooting and investigated the murder, testified that the five expended nine-millimeter shell casings recovered from the crime scene were fired from the same semiautomatic handgun.  Based on his investigation and his experience as a homicide detective, Detective Flesher opined that the bullet trajectories were consistent with the bullets having been fired from the threshold of the apartment door.  Barnes had currency in various denominations on his person, which was consistent with his having engaged in the sale of narcotics.  No firearm was found on Barnes's person.

Detective Albert Tello of the San Bernardino Police Department testified that he reviewed the surveillance camera video clips, and the clips, which were played while he was testifying, showed Walker—followed by Smith, Woods and Brown—going up the stairs and to the left toward Cooper's apartment.  Detective Tello testified that another video clip showed the man identified as Car Wash thereafter going up the stairs to Cooper's apartment.  Other video clips, also played during Detective Tello's testimony,

9

showed Walker, followed by Woods, running down the stairs and going out of the apartment complex to the SUV.

Detective Tello also testified that he spoke with Cooper about 12 hours after the shooting. Cooper described several distinctive tattoos she saw on the face of the man she saw on the balcony outside her apartment, who she did not know but later was identified as Woods. Specifically, Cooper described Woods's tattoos as a star with an H on his face, and some sort of cursive writing above his left eye. During that first interview, Cooper told Detective Tello she heard Walker say, "Hey Bishop, I need that." She also told Detective Tello she heard Barnes say, "Okay," and then, "Oh, shit," just before he was shot. Cooper also said she then heard gunshots and heard Walker say, "Oh, fuck," and Davis say, "[O]h, my God."

Detective Tello also testified that he interviewed Walker, who described seeing Woods extending his arm forward toward Barnes, while holding a gun, over the door threshold of Cooper's apartment.

2. *Woods's arrest in Las Vegas and his self-incriminating statement to the police*

On August 8, 2013, Woods was arrested in Las Vegas. Before Detective Tello read Woods his *Miranda*[4] rights, Woods said he wanted a lawyer and did not want to talk with the detectives. The detectives did not ask any questions, but Woods asked what it was all about, and Detective Tello told him he was being arrested for Barnes's murder.

---

4    *Miranda v. Arizona* (1966) 384 U.S. 436.

Woods quickly responded that he did not know anything about it and he had been in Las Vegas since April.

3. *Woods's recorded self-incriminating telephone call from jail*

A recording of a phone call Woods made from jail in early October 2013, which was transcribed, was played for the jury. Woods initially spoke with a woman named Bria about needing some "dollars" and then he asked her whether she had seen "Flash" (Brown). Bria replied she had not seen him, but she had heard he had been arrested. An unidentified male then got on the phone and spoke to Woods. The male told Woods that some people who were supposed to "holler" at him came and talked about "who doing the little talking and all types of shit, man like shit ugly." Woods replied as follows that he knew who was "talking" and who were "in it": "Yeah, I know, I see I know who talking and shit, I know who all in it, man I know, I know. You know what I'm talking about?" Woods said, "They ain't got shit on me cause I didn't do shit. I ain't even been out here fool." Woods also said he needed someone to contact "Toots" and tell her to "holler at the investigator" and "let [the investigator] know" where Woods was on the night of the murder. Woods gave Toots's phone number to the male he was talking to. Woods then said he had sent a letter to Toots, and the investigator would call Toots and "ask her like where [he (Woods)] been at and shit." Woods again spoke with Bria during this phone call. Woods told her an alibi was "all I need." He then told Bria, "All they need is an alibi and I'm walking up out this bitch."

11

4. *Prosecution's gang expert testimony*

Detective Joshua Simpson of the City of San Bernardino Police Department's gang unit testified as the prosecution's gang expert. He has personal experience with, and training about, the Hoover gang, a criminal street gang in San Bernardino that originated in Los Angeles. The Hoover gang has more than 2,500 documented members and even more associates. More than 100 Hoover gang members live in the City of San Bernardino.

Detective Simpson testified that the Hoover gang has nine subsets or "cliques." "Five Deuce," which stands for 52nd Street, is one of those cliques. The Hoover gang started as a Crip-based gang, but is no longer aligned with either Crips or Bloods. However, some Hoover gang members have aligned themselves with members of the Grape Street gang, which is a Crip-based gang. The Hoover gang and the East Coast Crips are rivals.

The Hoover gang's common symbols are "H" and a five-pointed star, the gang's colors are blue and orange, and its primary activities are narcotic sales, possession of firearms, assaults with firearms, and murder.

Detective Simpson testified about six predicate offenses committed by Hoover gang members, including one by Woods, that show the Hoover gang has engaged in a pattern of criminal activity. Specifically, (1) Woods was convicted of assault with a firearm, with personal use of a firearm, stemming from an incident in 2006; (2) Puna Smith was convicted of unlawful possession of a firearm with a finding he committed this offense for the benefit of a criminal street gang in 2007; (3) Melvin "Melly Mel" Craig

12

was convicted of carrying a loaded firearm in 2008; (4) James "Pooka" Jackson was convicted of possession of cocaine base for sale stemming from an incident in 2010; (5) Flash Brown was convicted of assault with a deadly weapon stemming from an incident in 2011; and (6) Jaquawn "Baby Stone" Oates was convicted of transportation of a controlled substance stemming from an incident in 2013. Detective Simpson opined that all six of these men were Hoover gang members.

Detective Simpson indicated he was familiar with Barnes, and testified that Barnes was associated with the Compton Cross Atlantic Piru gang, which is an "offshoot of the Blood set gang." Detective Simpson was familiar with Brown, and testified that Brown is a Hoover gang associate. Detective Simpson testified he also was familiar with Walker and indicated that Walker is a Hoover gang member. Walker had numerous Hoover gang tattoos, about which Walker testified in this case.

Detective Simpson opined that Woods was an active member of the 52nd Street or Five Deuce Hoover criminal street gang. He based his opinion in part on Woods's numerous gang-related tattoos, which include (among others) a five-pointed star with the letter H on his right cheek, the letters "YHG" for "young Hoover gangster" on his left cheek, stars on his upper right shoulder, the numbers "5" and "2" on the right side of his neck that refer to the 52nd Street or Five Deuce clique, the initials "HGC" on his neck that stand for "Hoover gangster criminal," a five-pointed star above his eyebrow, a diamond with the letter H for "Hoover" on his chest, a "52" on his upper abdomen representing the 52nd Street or clique, and another "52" on his left triceps muscle.

13

Detective Simpson also based his opinion in part on a photograph of Woods showing him using his right hand to give the Hoover gang sign, which is a representation of the letter H for Hoover, and on Woods's inmate classification form in which he indicated to Deputy Sanchez that he was a 52nd Street Hoover gang member. Detective Simpson testified he also considered information he reviewed pertaining to Woods's juvenile adjudication for felony discharging a firearm (§ 246.3) involving a case in which Woods and Oates were confronted in 2005 by a man who objected to their selling drugs in front of his home, Oates punched the man, and Woods fired a gun into the ground near the man to instill fear in him.[5] During this incident Woods was wearing orange shorts, which Detective Simpson opined were gang clothing because orange is the Hoover gang's color.

Detective Simpson also considered circumstances relating to Woods's adult conviction for felony assault with a firearm stemming from a 2006 incident involving Grape Street gang members during which Woods introduced himself by saying "Westside

---

[5]     Before Detective Simpson testified about this 2005 incident, the court gave the following limiting instruction: "This evidence that you're about to hear can only be used for a limited purpose. You cannot use this as evidence that the defendant has a propensity to commit crime or anything like that. It is to consider the basis of the officer's opinion, whether or not the defendant had a motive to commit the offenses that [are] alleged in this case or act with the intent to assist, further, or promote criminal conduct by gang members in this case. You may consider it for those purposes and not any others. Specifically, you cannot consider this evidence to conclude that the defendant is a bad character or is disposed to commit crime."

Hoover," he made a sign of disrespect, and then he got into a car with other gang members and participated in a drive-by shooting of a rival gang member.[6]

Detective Simpson also opined that Woods's role in the Hoover gang was that of a shooter and testified that he based this opinion on his reading about "[Woods's] past criminal activity" and information that "he has been known to carry firearms and shoot at people." Detective Simpson also opined that Walker's role in the Hoover gang was selling narcotics.

Detective Simpson further testified that the current offenses were gang-related because they were committed in the presence of gang members and associates—specifically, Walker, Davis, and the victim, Barnes—and they were the type of offenses that enhance both the shooter's and the Hoover gang's reputation. When asked a question based on a hypothetical set of facts paralleling the facts of the case, Detective Simpson opined that such facts showed the person's reputation as the shooter, someone willing to commit murder for the gang to instill fear.

B. *Defense Case*

The defense presented no affirmative evidence. During his closing argument, defense counsel argued that Walker shot Barnes.

---

6       Before Detective Simpson testified about this 2006 incident, the court alluded to its earlier limiting instruction (see fn. 5, *ante*), and told the jury: "Again, this is limited only for those purposes I told you about this incident."

DISCUSSION

## I. *ADMISSION OF EVIDENCE OF WOODS'S TWO PRIOR GANG-RELATED SHOOTINGS*

Woods first contends his convictions must be reversed because the court abused its discretion and violated his federal constitutional due process right to a fair trial by admitting under Evidence Code section 1101, subdivision (b) (hereafter Evidence Code section 1101(b)), evidence through the People's gang expert that he had committed two prior gang-related shootings. We reject this contention.

A. *Background*

1. *Current charge of active participation in criminal street gang* (*count 3*) *and the gang enhancement allegations* (*counts 1-2*)

As pertinent here, count 3 of the amended information charged Woods in this case with the commission of the crime of active participation in criminal street gang in violation of section 186.22, subdivision (a) (§ 186.22(a)) by unlawfully and actively participating in a criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and by promoting, furthering or assisting in felony criminal conduct by gang members. The amended information also alleged he committed the other two charged offenses─murder (count 1) and unlawful possession of a firearm by a felon (count 2)─for the benefit of, in association with, or at the direction of a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members in violation of section 186.22, subdivision (b)(1).

16

2. *Prosecution's motion in limine seeking admission of evidence of Woods's prior two gang-related shootings)*

The prosecutor brought a motion in limine asking the court to allow, under Evidence Code section 1101(b), the introduction of evidence of Woods's two prior gang-related shooting offenses for the purpose of proving his motive, knowledge, and intent in actively participating in a criminal street gang (count 3) in this case and in committing the murder and possession of a firearm by a felon for the benefit of, in association with, or at the direction of a criminal street gang within the meaning of the gang enhancement allegations (§ 186.22, subd. (b)) alleged in counts 1 and 2. Specifically, the prosecution sought to introduce evidence that in 2005, when Woods was a juvenile wearing orange gang colors,[7] he and a fellow Hoover gang member (Oates) were selling drugs in a residential neighborhood, a homeowner asked them to sell the drugs elsewhere, Oates struck him, and Woods pointed a handgun at the victim and then fired the gun into the ground. The prosecution also sought to introduce evidence that, as a result of this incident, Woods was adjudicated a juvenile offender for unlawfully possessing a firearm and brandishing a firearm. In addition, the prosecution sought to introduce evidence that in a later incident, in 2006, Woods exchanged gang affiliations with another man and, learning that the other man (the victim) was from a rival gang, got into a car, yelled "Westside Hoover," and fired multiple shots at the victim. The prosecution also sought to introduce evidence that, as a result of this incident, Woods was convicted of assault with

---

[7] The prosecutor argued that orange was "the primary color worn by the 52 Hoover gang."

17

a firearm (§ 245, subd. (a)(2)) with a true finding that he personally used a firearm in committing that offense (§ 12022.5, subd. (a)). The prosecutor argued the evidence would show the 2006 shooting occurred within two blocks of the 2005 shooting, and both of those shootings took place within three miles of the scene of the fatal shooting of Barnes in this case.

In support of this motion, the prosecutor argued the prior acts evidence was relevant under Evidence Code section 1101(b) to prove Woods "ha[d] shown a specific intent in all incidents to promote, further, and assist in criminal conduct of gang members." The prosecutor also argued that "[b]ecause [Woods] had committed a prior violent crime in the presence of the other fellow gang associates in the earlier cases as well as having committed the prior case with a specific intent to benefit his criminal street gang, this show[ed] not only [his] knowledge of what he had planned but also that he intended to shoot and/or kill[] the victims in all cases to benefit his gang." The prosecutor further argued the prior acts evidence showed Woods's motive to "benefit the gang and enhance his own reputation in the gang by shooting an individual in the presence of other gang members," as well as his knowledge of the consequences of shooting at a victim before he decided to shoot Barnes.

In addition, the prosecutor argued the prior acts evidence was probative as it tended to show the lengths to which Woods was willing to go for the gang by shooting and attempting to murder individuals. He also argued the evidence of the two prior shooting incidents was "not more prejudicial" than the evidence of the shooting of Barnes in this case, the evidence of those 2005 and 2006 shootings was "not too remote [in time]

18

to be admitted," and the evidence of those shootings would "show more than ample similarity" for the purpose of proving Woods's intent. Citing *People v. Zepeda* (2001) 87 Cal.App.4th 1183 (*Zepeda*), the prosecutor argued there were "overwhelming reasons for admitting evidence of the uncharged act[s]," including the "similarity in [Woods's] motive to benefit the gang, specifically as a shooter for the gang," because he "ha[d] shown a willingness . . . to promote the gang's primary activities of narcotics sales, and to promote the gang's reputation against rival gang members."

During the hearing on the motion in limine, the court characterized the prosecutor's argument as seeking to introduce the prior acts evidence "essentially to prove intent. Not necessarily intent to kill, but [specific] intent . . . for the gang allegation."

Defense counsel did not file a written opposition, but he opposed the motion at the hearing, stating that "[t]he danger of [Evidence Code section] 352 is because he's used a gun before that you know that he's used a gun again." Defense counsel argued that a limiting instruction would be needed and introduction of such evidence was "very dangerous." Defense counsel also argued (among other things) that there was a danger of confusing the jury and that the jury might conclude, "Well, he did it before, here he is doing it again." Woods's counsel further argued there was no evidence to show Woods knew the victim's gang status or affiliation, there was no evidence anyone called out the gang's name before Barnes was shot, and there was generally a lack of evidence to show the killing was gang-related. Rather, defense counsel argued, the evidence just tended to show Barnes was a drug dealer. Defense counsel summed up his argument up by reiterating the proffered evidence was "obviously prejudicial" and the biggest danger was

19

that it would be "used for the absolute wrong reasons . . . . He shot before, he shot again. That's exactly what it can't be used for." The court agreed, stating, "That's what it cannot be used for."

The prosecutor responded that the People were using the evidence of the prior shootings "so that the jury can derive what the specific intent was" and that a limiting instruction "would cure any improper use." The court asked the prosecutor whether the People's gang expert would be relying on the prior acts as the basis for his opinion, and the prosecutor responded, "Yes. Absolutely. Whether it's to benefit the gang or in association with a gang, yes."

a. *The court's findings and ruling*

Noting that *Zepeda*, *supra*, 87 Cal.App.4th 1183, was "quite informative," the court found that the "similarity prong ha[d] been met" because the evidence "involve[d] shootings in a relatively limited part of the city," the prior shootings were not too remote in time, and the "substantial" probative value of the evidence was "not outweighed by the prejudice in this case" for purposes of Evidence Code section 352. The court ruled the evidence of the prior shootings was admissible under Evidence Code section 1101(b). The court also ruled it would give a limiting instruction to the jury as requested by the defense.

3. *The court's limiting instructions at trial*

At trial, when the prosecution's gang expert, Detective Simpson, was testifying about the basis for his opinion that Woods was an active member of the Hoover gang and he had committed the crimes for the benefit of that gang, the court—before Detective

20

Simpson described the circumstances of Woods's 2005 gang-related shooting—gave the following limiting instruction to the jury regarding use of the evidence of the prior shootings:

> "This evidence that you're about to hear can only be used for a *limited purpose*. You cannot use this as evidence that the defendant has a propensity to commit crime or anything like that. It is to consider the basis of the officer's opinion, whether or not the defendant had a *motive* to commit the offenses that [are] alleged in this case or act with the *intent* to assist, further, or promote criminal conduct by gang members in this case. You may consider it for those purposes and not any others. Specifically, you cannot consider this evidence to conclude that the defendant is a bad character or is disposed to commit crime." (Italics added.)

Later, before Detective Simpson testified about Woods's 2006 shooting offense, the court alluded to its earlier limiting instruction and told the jury: "Again, this is limited only for those purposes I told you about this incident."

During final instructions, the court instructed the jury with CALCRIM No. 303: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

B. *Applicable Legal Principles*

a. *Evidence Code section 1101*

Evidence Code section 1101, subdivision (a) "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) Thus, evidence of other crimes or

21

bad acts is inadmissible when it is offered to show that a defendant had the criminal disposition or propensity to commit the crime charged. (Evid. Code, § 1101, subd. (a).)

Evidence Code section 1101(b) "clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*Ewoldt*, *supra*, 7 Cal.4th at p. 393, fn. omitted.) Specifically, Evidence Code section 1101(b) provides that nothing in that section "prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."

The admissibility of evidence under Evidence Code section 1101(b) depends on the degree of similarity between the uncharged act and the charged offense. (*Zepeda*, *supra*, 87 Cal.App.4th at p. 1210, citing *Ewoldt*, *supra*, 7 Cal.4th at p. 402.) The California Supreme Court has explained that for evidence of uncharged acts to be admissible under Evidence Code section 1101(b) to prove such facts as motive, intent, identity, or common design or plan, the charged offenses and uncharged acts must be "sufficiently similar to support a rational inference" of these material facts. (*People v. Kipp* (1998) 18 Cal.4th 349, 369.) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.) To be admissible to prove intent, the uncharged misconduct need only be "sufficiently similar [to the charged offense] to support the inference that the defendant '"probably harbor[ed] the same [or similar] intent in each instance."'"

(*Ibid*.; see *People v. Memro* (1995) 11 Cal.4th 786, 864-865 (*Memro*) [evidence of defendant's uncharged conduct of possessing sexually explicit photographs of young males ranging from prepubescent to young adult admissible as probative to show intent to sexually molest young boy].)

  b.  *Evidence Code section 352*

If the trial court determines that uncharged misconduct is admissible under Evidence Code section 1101(b), it must then determine whether the probative value of the evidence is " 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 404; Evid. Code, § 352.)  "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense. Other factors affecting the probative value include the extent to which the source of the evidence is independent of the charged offense, and the amount of time between the uncharged acts and the charged offense.  The factors affecting the prejudicial effect of uncharged acts include whether the uncharged acts resulted in criminal convictions and whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses." (*Zepeda*, *supra*, 87 Cal.App.4th at p. 1211.)  "The probative value of the evidence is enhanced if it emanates from a source independent of evidence of the charged offense." (*People v. Tran* (2011) 51 Cal.4th 1040, 1047 (*Tran*).)  "On the other hand, the prejudicial effect of the evidence is increased if the uncharged acts did not result in a criminal conviction.  This is because the jury might be inclined to punish the defendant for the uncharged acts regardless of whether it considers the

23

defendant guilty of the charged offense and because the absence of a conviction increases the likelihood of confusing the issues, in that the jury will have to determine whether the uncharged acts occurred."  (*Ibid*.)  "The potential for prejudice is decreased . . . when testimony describing the defendant's uncharged acts is no stronger or more inflammatory than the testimony concerning the charged offense."  (*Ibid*.)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is "prejudicial."  The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' "  (*People v. Karis* (1988) 46 Cal.3d 612, 638 (*Karis*).)

c.  *Standard of review*

We review the trial court's rulings under Evidence Code sections 1101 and 352 for an abuse of discretion.  (*People v. Lewis* (2001) 25 Cal.4th 610, 637.)  We will not disturb the trial court's exercise of discretion except upon a showing that it "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

24

C. *Analysis*

The court did not abuse its discretion or violate Woods's federal constitutional due process right to a fair trial by admitting under Evidence Code section 1101(b) the evidence that Woods committed the 2005 and 2006 shootings. The evidence of Woods's two prior gang-related shootings (discussed, *ante*) was material and highly probative on the issues of his intent and motive with respect both to the substantive count 3 charge in this case that he actively participated in a criminal street gang—the Hoover gang—in violation of section 186.22(a)), and to the gang enhancement allegations (§ 186.22(b)(1)(A) & (C)) in counts 1 and 2. As already discussed, the least degree of similarity between an uncharged act and a charged offense is required in order to prove intent, and—to be admissible to prove intent—the uncharged misconduct need only be sufficiently similar to the charged offense to support the inference that the defendant probably harbored the same or similar intent in each instance. (*Ewoldt*, *supra*, 7 Cal.4th at p. 402; see *Memro*, *supra*, 11 Cal.4th at pp. 864-865.) Although motive normally is not an element of any crime, evidence of motive is always relevant because it "'makes the crime understandable and renders the inferences regarding defendant's intent more reasonable.'" (*People v. Riccardi* (2012) 54 Cal.4th 758, 815, abrogated on another point by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

Here, apart from the independent evidence of the prior shootings that Woods committed in 2005 and 2006, the evidence at trial regarding the three crimes charged in this case─murder, unlawful possession of a firearm by a felon, and active participation in a criminal street gang─showed no obvious reason why Woods shot Barnes, because there

25

was no evidence of any fight, confrontation, or provocation. However, as discussed in detail, *ante*, in the factual background, the prosecution presented substantial evidence that Woods was a member of the Hoover criminal street gang, that Barnes was a member of a rival Blood gang, and that Woods went with his fellow Hoover gang members to Cooper's apartment where Barnes was staying and selling narcotics. The evidence of the two prior shootings admitted under Evidence Code section 1101(b) supported a reasonable inference that, in shooting Barnes, Woods was actively and knowingly participating in, and promoting, the criminal activity of his gang within the meaning of Penal Code section 186.22(a), and that he shot Barnes for the benefit of his gang with the specific intent to promote the criminal activity of its members and enhance his own reputation in the gang. As discussed in greater detail, *ante*, the evidence of the 2006 shooting incident shows Woods introduced himself to the victim by saying "Westside Hoover," and shot the victim after learning he was from a rival gang. The evidence of the 2005 shooting incident shows that Woods, who was wearing Hoover gang colors and selling narcotics with another member of the Hoover gang, pulled out a firearm and fired bullets near the victim, who had asked Woods and his gang companion to not sell drugs in front of his home.

Thus, the challenged evidence of the two prior shooting incidents was relevant to prove Woods's intent and motive. In this regard the *Zepeda* case, on which the court relied, is illustrative. In *Zepeda*, the shooting victim, who was a member of a gang, had been killed in an apparent gang-related drive-by shooting. (*Zepeda*, *supra*, 87 Cal.App.4th at p. 1190.) The defendant belonged to a rival gang. (*Id.* at p. 1190.) The

26

trial court admitted, under Evidence Code section 1101(b), evidence of the defendant's involvement in a prior gang-related shooting, ruling the incident was relevant to show defendant's motive and intent because it would show "'an intention upon the part of the defendant to engage in hostile action for no particular reason other than that the recipient of the hostile action is a member of an opposing gang. And it show[ed] certainly more than an average degree of motivation to follow the dictates of the gang in this regard to pursue gang policy.'" (*Zepeda*, at p. 1211.) Affirming the defendant's murder conviction, the *Zepeda* court upheld the trial court's ruling that the evidence of the defendant's involvement in the prior gang-related shooting incident was "relevant to prove defendant's intent and motive" because "[t]he fact that [the] defendant previously committed a drive-by shooting, under circumstances indicating that he did so for gang-related purposes, helped show that he likely committed the instant drive-by shooting for gang-related purposes." (*Id.* at p. 1212.)

Similarly here, the evidence of Woods's prior gang-related assaults on others with a firearm in response to minimal or nonexistent confrontation, provocation, or challenge to Woods's Hoover gang was relevant and admissible to prove his motive and intention to engage in hostile action against a rival gang member for no reason other than to benefit or promote his gang and his own gang reputation, and to "'follow the dictates of the gang . . . to pursue gang policy.'" (*Zepeda*, *supra*, 87 Cal.App.4th at p. 1211.) The similarity requirement is met because the evidence showed the prior shooting incidents were gang-related and were sufficiently similar to the charged offenses—murder with a gang enhancement allegation and active participation in a criminal street gang—to support

27

the inference that Woods probably harbored the same or similar intent, and acted with a similar motivation, in each instance. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 402; *Memro*, *supra*, 11 Cal.4th at pp. 864-865.)

We also conclude the court did not abuse its discretion by ruling that the probative value of the challenged evidence was "not outweighed by the prejudice in this case" for purposes of Evidence Code section 352. Regarding probative value, we have concluded that the prior gang-related shooting incidents are sufficiently similar to the charged offenses of murder with a gang enhancement allegation and active participation in a criminal street gang. Also, "[t]he fact that the evidence of the prior incident[s] had an independent source from the evidence of the charged offense increased [their] probative value." (*Zepeda*, *supra*, 87 Cal.App.4th at p. 1212.) In addition, the prior incidents occurred in September 2006 and August 2005, about seven and eight years, respectively, before this shooting in June 2013. Although these amounts of time are somewhat greater than the five years that had elapsed in *Zepeda*, here, as in that case, the probative value of the prior shootings was not affected "[a]s 'only a few years elapsed'" (*Zepeda*, at p. 1212) between the prior shootings and the current shooting. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 405; cf. *People v. Harris* (1998) 60 Cal.App.4th 727, 739 ["[a]lthough there is no bright-line rule," remoteness of 23-year-old prior incident "weighs strongly in favor of exclusion"].)

Regarding the prejudicial effect of the evidence of the prior gang-related shootings, that evidence was undoubtedly damaging. However, as already discussed, "prejudicial" is not synonymous with "damaging" for purposes of Evidence Code section

28

352, and the "prejudice" referred to in that section "'applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (*Karis*, *supra*, 46 Cal.3d at p. 638.) Here, the prejudicial effect of the challenged evidence is diminished because, as Detective Simpson testified, the two prior shootings resulted in convictions. (See *Tran*, *supra*, 51 Cal.4th at p. 1047.) The prejudicial effect is also diminished because the evidence describing Woods's prior gang-related acts—firing a bullet near the first victim to instill fear, and shooting, but not executing, the second victim—was no stronger or more inflammatory than the evidence concerning the shooting of Barnes, who (as discussed, *ante*, in the factual background) was shot five times and died from execution-style gunshot wounds to the back of his head while lying on the floor of Cooper's apartment. In addition, as we have noted, the court gave limiting instructions to the effect that the jury could not use the evidence of the prior shootings to conclude that Woods has a bad character or is disposed to commit crime.

We reject Woods's claim that the evidence of his prior shootings was improperly used to prove his identity as the shooter in this case. In any event, the California Supreme Court has rejected a contention that evidence of uncharged prior crimes or misconduct is inadmissible for a purpose other than proving identity if the identity of the perpetrator is in dispute. (*People v. Foster* (2010) 50 Cal.4th 1301, 1332-1333.)

## II. *ADMISSIBILITY OF EVIDENCE OF ONE OF WOODS'S TWO PRIOR CONVICTIONS AS A PREDICATE OFFENSE*

Woods also contends the court violated his federal constitutional due process right to a fair trial by allowing the prosecution's gang expert, Detective Simpson, to testify

about Woods's prior conviction of assault with a firearm, which stemmed from the 2006 shooting incident (discussed, *ante*), as one of six predicate offenses supporting both the charge that Woods actively participated in a criminal street gang and the gang enhancement allegations. We reject this contention.

A. *Background*

The amended information charged Woods in count 1 with Barnes's murder (§ 187, subd. (a)), in count 2 with possession of a firearm by a felon (§ 29800, subd. (a)), and in count 3 with active participation in a criminal street gang (§ 186.22(a)). As pertinent here, counts 1 and 2 contained gang enhancement allegations that Woods committed the murder and was in possession of a firearm by a felon for the benefit of, at the direction of, or in association with, a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members in violation of section 186.22, subdivisions (b)(1)(A) and (C).

"The California Street Terrorism Enforcement and Prevention Act [(§ 186.20 et seq.)] criminalizes active participation in a criminal street gang (§ 186.22[(a)])." (*Tran*, *supra*, 51 Cal.4th at p. 1044.) "A criminal street gang is any ongoing association that has as one of its primary activities the commission of certain criminal offenses and engages through its members in a 'pattern of criminal gang activity.'" (*Ibid.*, quoting § 186.22, subd. (f).) "A pattern of criminal gang activity is 'the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more' specified criminal offenses within a certain time frame, 'on

30

separate occasions, or by two or more persons'" (*Tran*, at p. 1044, quoting § 186.22, subd. (e)), which are referred to as "predicate offenses." (*Tran*, at p. 1044.)

"[A] predicate offense may be established by evidence of an offense the *defendant* committed on a separate occasion." (*Tran*, *supra*, 51 Cal.4th at p. 1044, italics added.) "[T]hat the prosecution may have the ability to develop evidence of predicate offenses committed by other gang members does not require exclusion of evidence of a defendant's own separate offense to show a pattern of criminal gang activity." (*Ibid.*)

Here, in order to meet their burden of proving both the substantive count 3 charge that Woods actively participated in a criminal street gang and the gang enhancement allegations in counts 1 and 2, the People presented—through their gang expert, Detective Simpson—evidence of six predicate offenses committed by Hoover gang members, including one by Woods, to prove the Hoover gang was a criminal street gang because it had engaged in a pattern of criminal activity. (See § 186.22, subds. (e) & (f).) In testifying about the predicate offenses, Detective Simpson did not discuss the details of those crimes; he only testified to the nature of each offense, the identity of the offender, and the offender's relationship with the Hoover gang. Specifically, as pertinent here, Detective Simpson testified that Woods was a member of the Hoover gang and he had been convicted of assault with a firearm, with a finding he had personally used the firearm, stemming from a 2006 shooting incident. The five other predicate offenses committed by members of the Hoover gang, about which Detective Simpson testified, included a felony committed by Woods's codefendant Puna Smith during a 2007 incident,

31

and another felony committed by Woods's codefendant Flash Brown during a 2011 incident.

B. *Analysis*

Woods contends that because there was "ample other evidence" to show his gang affiliation and to establish that the Hoover gang is a criminal street gang within the meaning of section 186.22, the prosecutor did not need to rely on his prior felony conviction for assault with a firearm as a predicate offense to support the gang charge and gang enhancement allegations under section 186.22. Stating that his "admission to gang membership and tattoos were sufficient . . . to show his affiliation with the gang," Woods also contends that "[t]he circumstances of the prior assault were not similar to the charged crimes and its prejudicial effect should have tipped the balance in favor of exclusion" under Evidence Code section 352.[8] We reject these contentions.

As already discussed, the California Supreme Court held in *Tran* that "a predicate offense may be established by evidence of an offense the *defendant* committed on a separate occasion." (*Tran*, *supra*, 51 Cal.4th at p. 1044, italics added.) "Further," the *Tran* court explained, the fact "that the prosecution may have the ability to develop evidence of predicate offenses committed by other gang members does not require exclusion of evidence of a defendant's own separate offense to show a pattern of criminal

---

[8]     Under Evidence Code section 352, evidence is properly excluded if its probative value is "substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *People v. Cudjo* (1993) 6 Cal.4th 585, 609.)

32

gang activity." (*Ibid*.)  Noting that "Evidence Code section 352 requires the exclusion of evidence . . . when its probative value is substantially outweighed by its prejudicial effect" (italics omitted), the Supreme Court acknowledged that, "[w]ithout doubt, evidence a defendant committed an offense on a separate occasion is inherently prejudicial." (*Id.* at p. 1047.)  However, "the inherent prejudice from a defendant's separate gang-related offense typically will be less when the evidence is admitted to establish a predicate offense in a prosecution for active participation in a criminal street gang, than when it is admitted to establish an intermediary fact from which guilt may be inferred." (*Id*. at p. 1048.)

Here, for reasons discussed, *ante*, we have already concluded that the court, in admitting Detective Simpson's testimony regarding Woods's 2005 and 2006 gang-related shootings, did not abuse its discretion by ruling that the probative value of that evidence was "not outweighed by the prejudice in this case" for purposes of Evidence Code section 352.  For the same reasons, which we need not repeat here, we reject Woods's contention that the court should have excluded, as unduly prejudicial under Evidence Code section 352, Detective Simpson's brief testimony regarding Woods's prior felony conviction for assault with a firearm, which stemmed from the 2006 shooting incident, to establish the predicate offenses for the substantive gang charge and gang enhancement allegations.

We also reject Woods's suggestion that the court also erred in admitting evidence of his prior felony conviction for assault with a firearm because proof of six predicate offenses was prejudicially cumulative.  As noted, when Detective Simpson testified about the six predicate offenses, he did not discuss the details of those crimes; he only testified

33

to the nature of each offense, the identity of the offender, and his expert opinion that each of the six offenders was a member of the Hoover gang. We conclude the court did not abuse its discretion or violate Woods's federal constitutional due process right to a fair trial by allowing Detective Simpson to testify about those six crimes to establish the predicate offenses for the substantive gang charge and gang enhancement allegations. (See *People v. Hill* (2011) 191 Cal.App.4th 1104, 1138-1139 [no bright-line limit on number of predicate offenses; proof of eight predicate offenses not cumulative or unduly prejudicial].)

## III. *ASSERTED ERROR IN ACCOMPLICE JURY INSTRUCTIONS*

Woods next contends the court committed prejudicial instructional error, and violated his federal constitutional due process right to a fair trial, by failing to instruct the jury sua sponte under CALCRIM No. 335 that Walker was an accomplice as a matter of law, and that the jurors could not rely on Walker's testimony to find Woods guilty of Barnes's murder without sufficient corroborating evidence to show that Walker's testimony was reliable and credible. We reject this contention.

A. *Background*

1. *Charges against Woods and Walker*

a. *Woods*

As previously noted, Woods was charged with murder (count 1: § 187, subd. (a)), possession of a firearm by a felon (count 2: § 29800, subd. (a)), and active participation in a criminal street gang (count 3: § 186.22(a)).

34

Counts 1 and 2 contained gang enhancement allegations that Woods committed the murder and the possession of a firearm by a felon for the benefit of, at the direction of, or in association with, a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members in violation of section 186.22, subdivisions (b)(1).

b. *Walker*

Walker, who was one of Woods's codefendants named in the felony complaint, was charged in count 3 of the complaint with active participation in a criminal street gang (§ 186.22(a)), and in count 4 with being an "ACCESSORY AFTER THE FACT—(KNOWLEDGE OF CRIME)" in violation of section 32. As pertinent here, count 4 charged that Walker, "having knowledge that the crime of Murder . . . had been committed by [Woods], did harbor, conceal, and aid [Woods], with the intent that [he] might avoid and escape from arrest, trial, conviction, and punishment for said felony."

Count 4 contained a gang enhancement allegation that Walker, in committing the "above offense" of being an accessory to Barnes's murder, acted "for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members" in violation of section 186.22, subdivision (b)(1).

2. *Walker's guilty plea and trial testimony*

Before Woods's trial began, Walker pleaded guilty to being an active participant in a criminal street gang as charged in count 3, and to being an *accessory to Barnes's murder* as charged in count 4. He also admitted the truth of the count 4 gang

35

enhancement allegation that, in committing the offense of *being an accessory to Barnes's murder*, he acted "for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members" in violation of section 186.22, subdivision (b)(1). During Woods's trial, Walker testified for the prosecution pursuant to his plea bargain.

Walker's lengthy trial testimony is summarized, *ante*, in the factual background. The issue of whether Walker participated as a principal in the commission of Barnes's murder, and thus whether Walker was an accomplice and not just an accessory to the murder, was *disputed*. Specifically, the prosecutor asked Walker, at the end of his direct examination of Walker, whether he shot Barnes, and Walker replied, "No, I didn't." The prosecutor also asked Walker, "Did you know this was going to happen to [Barnes]?" Walker answered, "No."

3. *CALCRIM Nos. 334 (given by the court) and 335 (not given)*

a. *CALCRIM No. 334*

The court instructed the jury under CALCRIM No. 334 ("Accomplice Testimony Must Be Corroborated: Dispute Whether Witness Is Accomplice"), directing the jurors to decide—before considering Walker's testimony "as evidence against [Woods] regarding the crime of *murder*" (italics added) —"whether [Walker] was an accomplice to *that crime*" (italics added), murder.

The court then instructed the jury under CALCRIM No. 334 on the meaning of "accomplice." Specifically, the court told the jurors:

36

"A person is an *accomplice* if he or she is subject to prosecution for the identical crime charged against the defendant. Someone is subject to prosecution if: [¶] 1. He or she personally committed the crime; [¶] OR [¶] 2. He or she knew of the criminal purpose of the person who committed the crime; [¶] AND [¶] 3. He or she intended to, and did in fact. aid, facilitate, promote, encourage, or instigate the commission of the crime or participate in a criminal conspiracy to commit the crime."

The court also instructed the jurors that, if they decided Walker was an accomplice (to Barnes's murder), they "[could] not convict [Woods] of murder based on [Walker's] testimony alone," and they "[could] use [Walker's testimony] to convict [Woods] only if: [¶] 1. [Walker's testimony] [was] supported by other evidence [they] believe[d]; [¶] 2. That supporting evidence [was] independent of [Walker's testimony]; [¶] AND [¶] 3. That supporting evidence tend[ed] to connect [Woods] to the commission of the crime."

As pertinent here, the court's instruction under CALCRIM No. 334 also told the jurors it was Woods's burden "to prove that it [was] more likely than not that [Walker] was an accomplice" and that, if they decided Walker was an accomplice to Barnes's murder, the independent evidence supporting Walker's testimony could be "slight," it "[did] not need to be enough, by itself, to prove that [Woods] [was] guilty of the charged crime" (murder), and Walker's testimony "should be viewed with caution."

b. *CALCRIM No. 335*

By claiming on appeal that the court erred in giving CALCRIM No. 334 and in failing to sua sponte give CALCRIM No. 335 ("Accomplice Testimony: No Dispute Whether Witness Is Accomplice"), Woods implicitly acknowledges his trial counsel did

37

not ask the court to instruct the jury under CALCRIM No. 335, which would have informed the jurors that Walker was an accomplice as a matter of law, and that they could use Walker's testimony to convict Woods only if his accomplice testimony was supported by other credible evidence, even if that evidence was "slight," that was independent of Walker's testimony and tended to connect Woods to Barnes's murder.  (See CALCRIM No. 335.)

B.  *Applicable Legal Principles*

"A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense."  (§ 1111.)

"'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense.'"  (*People v. Gonzalez and Soliz* (2011) 52 Cal.4th 254, 303.)  "'The [corroborating] evidence is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.'"  (*Ibid.*)

Section 1111 defines an accomplice as "one who is liable to prosecution for the *identical offense* charged against the defendant on trial in the cause in which the testimony of the accomplice is given."  (§ 1111, italics added.)

For a witness to be chargeable with an "identical offense" for purposes of determining whether the witness is an accomplice within the meaning of section 1111, he or she "must be considered a principal under section 31."  (*People v. Lewis* (2001) 26 Cal.4th 334, 368-369, fn. omitted.)  Section 31 defines principals as "[a]ll persons

concerned in the *commission* of a crime, whether . . . they directly commit the act constituting the offense, or aid and abet in its commission . . . ."  (§ 31, italics added.) "An aider and abettor is one who acts with *both* knowledge of the perpetrator's criminal purpose and the intent of encouraging or facilitating commission of the offense." (*People v. Avila* (2006) 38 Cal.4th 491, 564 (*Avila*), italics added.)  Thus, "[a]n accomplice must have '"guilty knowledge and intent with regard to the *commission* of the crime."'"  (*People v. Lewis*, *supra*, 26 Cal.4th at p. 369, italics added.)

The term "accomplice" does not include an accessory.  (*People v. Boyer* (2006) 38 Cal.4th 412, 467 (*Boyer*).)  Section 32 defines an accessory as "[e]very person who, *after* a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof . . . ."  (Italics added.)

Whether a witness is an accomplice within the meaning of section 1111 is a factual question for the jury to decide unless there can be no dispute concerning the evidence or the inferences to be drawn from the evidence on this question.  (*People v. Whalen* (2013) 56 Cal.4th 1, 58-59 (*Whalen*), disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17; *Avila, supra,* 38 Cal.4th at p. 565.) "Thus, a trial court can determine 'as a matter of law whether a witness is or is not an accomplice only when the facts regarding the witness's criminal culpability are "clear and undisputed."'"  (*Avila*, at p. 565.)

"'If there is evidence from which the jury could find that a witness is an accomplice to the crime charged, the court must instruct the jury on accomplice testimony.'" (*People v. Lewis*, *supra*, 26 Cal.4th at p. 369; see *Boyer*, *supra*, 38 Cal.4th at p. 466 ["The court need give such instructions [on accomplice testimony] only where there is substantial evidence that the witness was an accomplice."].)

C. *Analysis*

1. *Attorney General's forfeiture claim*

We first reject the Attorney General's claim that Woods forfeited his claim of instructional error. The California Supreme Court has explained that, "'[g]enerally, a party may not complain on appeal that an instruction *correct in law* and responsive to the evidence was *too general* or *incomplete* unless the party has requested appropriate clarifying or amplifying language.'" (*People v. Guiuan* (1998) 18 Cal.4th 558, 570 (*Guiuan*), italics added.)

Here, the Attorney General asserts that Woods "forfeited any objection to the instruction"—CALCRIM No. 334 (discussed, *ante*)—"as given by failing to request the modification or clarification that Walker was an accomplice . . . ." However, the Attorney General misunderstands Woods's claim of instructional error. Woods is not claiming that the court's instruction under CALCRIM No. 334 was correct in law but too general or incomplete, and he is not claiming the court erred by failing to give sua sponte a modifying or clarifying instruction that Walker was an accomplice. Woods essentially is claiming that (1) the court's instruction under CALCRIM No. 334 was *not* correct in law because (he maintains) Walker was an accomplice "as a matter of law"; and, thus, (2)

40

the court erred by giving CALCRIM No. 334 and by failing to instruct the jury sua sponte under CALCRIM No. 335. Thus, we conclude the forfeiture rule is not applicable here. (*Guiuan*, *supra*, 18 Cal.4th at p. 570.)

2. *Merits*

We reject Woods's claim of instructional error, which is based on his contention that the court erred by giving CALCRIM No. 334─under which the jury, before considering Walker's testimony, was required to decide whether he was an accomplice to Barnes's murder─and by failing to instruct the jury sua sponte under CALCRIM No. 335─under which the court would have directed a finding that Walker was an accomplice to the murder─because (Woods asserts) Walker was an accomplice "as a matter of law." As already discussed, whether a witness is an accomplice within the meaning of section 1111 is a factual question for the jury to decide *unless* there can be *no dispute* concerning the evidence or the inferences to be drawn from the evidence on this question. (*Whalen*, *supra*, 56 Cal.4th at pp. 58-59; *Avila*, *supra*, 38 Cal.4th at p. 565.) Thus, in this case, the court could determine Walker was an accomplice to Barnes's murder as a matter of law, and so instruct the jury under CALCRIM No. 335 rather than under CALCRIM No. 334, only if the facts regarding Walker's criminal culpability as an accomplice were clear and undisputed. (See *Avila*, at p. 565.)

Here, the question of whether Walker was an accomplice to Barnes's murder, and not just an accessory, was disputed. For purposes of section 1111, the term "accomplice" does not include an accessory. (*Boyer*, *supra*, 38 Cal. 4th at p. 467.) "An accomplice must have '"guilty knowledge and intent with regard to the *commission* of the crime."'"

(*People v. Lewis*, *supra*, 26 Cal.4th at p. 369, italics added.) Before Woods's trial began, Walker pleaded guilty to being an accessory after the fact to the murder as charged in count 4 of the felony complaint. Walker also admitted the truth of the count 4 gang enhancement allegation that, in committing the offense of being an accessory to Barnes's murder, he acted for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members. During Woods's trial, the prosecutor asked Walker whether he shot Barnes, and Walker replied, "No, I didn't." The prosecutor also asked Walker, "Did you know this was going to happen to [Barnes]?" Walker answered, "No." Through this testimony, Walker essentially disputed both that he was a principal in the commission of Barnes's murder, and that he was an accomplice to that crime. (*People v. Lewis*, *supra*, 26 Cal.4th at pp. 368-369.)

Because the question of whether Walker was an accomplice to Barnes's murder was disputed at trial, the court properly instructed the jury under CALCRIM No. 334, and properly refused to instruct the jury under CALCRIM No. 335. (See Bench Notes to CALCRIM No. 335 (2016 ed.) p. 107 ["If there is a dispute about whether the witness is an accomplice, give CALCRIM No. 334, *Accomplice Testimony Must Be Corroborated*: *Dispute Whether Witness Is Accomplice.*"].) The court did not violate Woods's federal constitutional right to a fair trial.

IV. *CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL*

Woods also contends his defense counsel provided ineffective assistance in violation of Woods's Sixth Amendment rights by failing to object to (1) the reliance of

42

the People's gang expert, Detective Simpson, on the evidence of Woods's 2006 conviction of assault with a firearm (discussed, *ante*) to form his opinion that Woods was a shooter for the Hoover criminal street gang; (2) the prosecution's use of Woods's 2006 conviction of assault with a firearm as one of six predicate offenses to prove that the Hoover gang is a criminal street gang, and (3) the prosecutor's statements during closing argument that the 2005 and 2006 prior shootings showed Woods's motive as a shooter for the Hoover gang.

In response, the Attorney General argues that defense counsel's performance was not deficient because (1) counsel "made appropriate strategic decisions while providing a vigorous defense"; (2) "[w]hen the trial court ruled on the admissibility of [Woods's] prior convictions, he considered the use of the prior convictions as evidence of [Woods's] intent and motivation and as a basis for the [People's] expert's opinion"; (3) "[t]he analysis he conducted was equally applicable to [the] use of [Woods's] prior conviction [of assault with a firearm] as a predicate offense proving that [the Hoover gang] was a criminal street gang"; (4) the "evidence of [Woods's] prior shootings was properly admitted at trial"; and (5) "the prosecutor referred to [Woods's] prior actions only in the proper context of his motivation and intent to benefit the gang and as the basis for the expert's opinion." The Attorney General argues also argues that, "in light of the strong evidence against [Woods], there was no reasonable likelihood that [he] would have received a more favorable result if his counsel had made further objections."

For reasons we shall explain, we reject Woods's claim that his trial counsel provided ineffective assistance of counsel.

43

A. *Applicable Legal Principles*

To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and, of particular importance here, (2) the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To show prejudice, the defendant must show a reasonable probability she would have received a more favorable result had her counsel's performance not been deficient. (*Strickland*, at p. 694; *Ledesma*, at pp. 217-218.)

B. *Analysis*

In his reply brief, Woods acknowledges that, "[i]f no additional objections were necessary to preserve the issues raised on appeal relating to the characterizations of [him] as the shooter for the gang or to the admission of the prior assault with a firearm conviction as a predicate offense, the [he] agrees, [defense] counsel did his job." However, he also asserts that, "if [defense] counsel should have objected and at least made further record of the prejudicial harm to [him] by the various uses of his prior convictions at trial, then he rendered constitutionally deficient performance."

We conclude no additional defense objections were necessary at trial to preserve the issues Woods has raised on appeal, and thus his trial counsel's failure to raises such additional objections did not constitute ineffective assistance of counsel. We discussed in detail, *ante*, the People's motion in limine to admit under Evidence Code section 1101(b) evidence of Woods's prior two gang-related shootings, as well as defense counsel's

44

vigorous and thorough objections to that motion, the parties' arguments during the hearing on that motion, and the court's findings and rulings. We also have discussed the proper limiting instruction the court repeatedly gave to the jury. On this record, it appears additional defense objections were unnecessary and would have been futile.

## V. *CLAIM OF CUMULATIVE ERROR*

Last, Woods contends cumulative error requires reversal of the judgment. We reject this contention.

"'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) A defendant is "entitled to a fair trial but not a perfect one." (*Ibid*.)

Here, we have concluded there was no error. Thus, there were no errors that could rise by accretion to the level of reversible and prejudicial error. Woods received a fair trial. Accordingly, we affirm the judgment.

## DISPOSITION

The judgment is affirmed.


NARES, Acting P. J.

WE CONCUR:


McINTYRE, J.


O'ROURKE, J.

45